## In re HOWARD.
### Patent Appeal No. 2781.

Court of Customs and Patent Appeals.
Dec. 7, 1931.

Charles M. Thomas, of Washington, D. C., for appellant.

T. A. Hostetler, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office, affirming the decision of the Examiner in rejecting appellant's claims 26, 27, 28, and 30 to 37, inclusive, as defining nothing patentable over the prior art. At the oral hearing before us the appellant dismissed the appeal as to claims 28, 31, and 35. The claims in issue are contained in appellant's reissue application, filed on March 10, 1927. For the purposes of this appeal the claims may be divided into two groups, in the first of which are claims 26, 27, and 30, while claims 32, 33, 34, 36, and 37 comprise the second group. Claim 26 is illustrative of the first group, and claim 32 of the second; these claims read as follows:

"26. A method of making gasoline which consists in subjecting charging oil to cracking conditions of temperature and a superatmospheric pressure to convert the oil to produce hydrocarbon substances containing gasoline and heavier fractions, in separating the heavier fractions from the lighter gasolinelike products thereby producing a refractory distillate, and in subjecting a liquid body of such distillate, to a cracking temperature while under a substantially increased pressure in an independent cracking zone where the distillate remains segregated from the unvaporized fractions of the charging oil."

"32. A process for cracking hydrocarbon oil comprising continuously advancing a stream of charging oil through a heating zone where it is subjected to a cracking temperature and thence delivered to an enlarged zone, maintaining a superatmospheric pressure on said oil stream and in the enlarged zone, in continuously removing vapors generated from the oil from the enlarged zone while withdrawing unvaporized oil from such enlarged zone to maintain the vapors produced of a substantially uniform composition throughout the normal run of the process, in condensing heavier vapors without condensing the lighter gasoline-like vapors, thereby producing a refractory distillate of substantially uniform composition, and in continuously subjecting such distillate to a cracking temperature substantially greater than the temperature to which the charging oil is initially heated while maintained in an independent cracking zone segregated from the initial charging oil undergoing conversion to convert substantial portions of said distillate into gasoline-like products."

The references relied upon are: Pielsticker, 477,153, June 14, 1892; Curran, 1,255,714, February 5, 1918; Sherman, 1,260,584, March 26, 1918; Rosenbaum, 1,324,983, December 16, 1919; Rittman, 1,462,247, July 17, 1923.

The process shown in appellant's application consists of introducing charging oil into a coil; said coil being located within a furnace. Here the oil is heated to a cracking temperature, being at the same time sub-

jected to a pressure in excess of atmospheric. The oil passes from said coil to a converting chamber in which vapors are released; said vapors arising and passing into a condenser, designated in the specification as an aerial condenser. Here the vapors which are heavier than gasoline are condensed, while the gasoline vapors themselves are carried off to a final condenser, flowing therefrom to the final receiving tank. The distillate resulting from the condensation of the heavier vapors in the aerial condenser descends into the standard of said condenser and is forced by a pump into a second still within another furnace. Here this condensate is subjected to another cracking reaction under temperature and pressure conditions higher than prevailed in the first still. The resultant vapors are carried again to the aerial condenser where, as before, the gasoline vapors are transmitted to the final condenser and thence to the aforementioned receiving tank. In each of the stills there is a draw-off pipe for the purpose of removing therefrom all unvaporized oil.

The Board of Appeals held that claims 26, 27, and 30 were properly rejected by the Examiner upon the reference Curran, in view of the reference Rosenbaum, Sherman, or Rittman. Appellant assigns this as error, and contends that the references showing prior art cannot be legitimately combined, and further that, even if combined, they do not anticipate appellant's invention.

■ The principal reference relied upon by the Board is the Curran patent. This is an apparatus patent, while the claims here in issue are process claims. Appellant contends that a process patent can only be anticipated by a similar process, and relies upon the case of Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 S. Ct. 698, 46 L. Ed. 968, in support of such contention. In the case of In re Earl Ackenbach, 45 F.(2d) 437, 439, 18 C. C. P. A. (Patents) 769, we had occasion to consider a similar contention, in which case we said:

"Carnegie Steel Co. v. Cambria Iron Co., states the rule to be that a process patent is not anticipated by a mechanism which might with slight alterations, be adapted to carry out that process, *unless such use of it would have occurred to one whose duty it was to make practical use of the mechanism described.* That case, however, as do other authorities, recognizes the rule that, if a previously patented device, in its normal and usual operation, will perform the function which an appellant claims in a subsequent

application for process patent, then such application for process patent will be considered, to have been anticipated by the former patented device. Re Chapman, 41 App. D. C. 258; Claude Neon Lights v. Machlett & Son (C. C. A.) 27 F.(2d) 702–708; In re Watson, 44 F.(2d) 868, 18 C. C. P. A. (Patents) 712." (Italics not quoted.)

■ Applying the rule as above stated to the case at bar, we find that the operation of Curran's apparatus in the manner described in his disclosure involves substantially the same process as that embraced in said claims 26, 27, and 30, except that Curran does not disclose the element of "a substantially increased pressure in an independent cracking zone," and he drains the unvaporized oil from his primary zones into his independent cracking zone. While the Examiner, as shown by the record, and the Solicitor in his brief, suggest that Curran does employ increased pressure in the independent cracking zone, indicated by the fact that the drawings show a gauge upon the independent cracking zone, and there is a statement in his specification that "each still is also provided with gages 5, whereby an operator may ascertain at any time the pressure conditions within the still," we do not think that Curran suggests that there shall be any greater pressure in the secondary cracking zone than in the primary stills. We think that he does clearly contemplate pressure produced by heat in both zones, but makes no distinction between them. His specification states that in the primary stills "the heating is continued until about 150 pounds pressure or even more is produced in the stills. * * *" Nowhere does he indicate that a greater pressure is to be produced in the secondary cracking zone. However, the Board of Appeals in its decision assumed that Curran did not disclose increased pressure in the independent cracking zone, but held, as did also the Examiner, that there would be no invention in this feature in view of the references Rosenbaum, Sherman, or Rittman.

While we are not clear that the references Rosenbaum and Rittman teach the desirability of increased pressure to assist in the cracking of condensates resulting from the first cracking operation, we are clear that the Sherman patent does teach this. Sherman states in his specification that "it is known that the lighter the component of crude oil or petroleum, the more difficult it is to crack, requiring for this purpose an increasingly higher pressure," and his specification clearly shows that the cracking of the

condensates secured from the initial cracking process is at a higher pressure than was employed in such initial process. If, therefore, it was well known in the art that to crack condensates resulting from an initial cracking operation required a higher pressure than was employed in such initial operation, there clearly would be no invention in applying such higher pressure in the secondary still of Curran, since it would involve merely an adjustment of the valves so that, upon the application of heat, a higher pressure would result in the secondary still than was employed in the initial process.

However, as before noted, Curran drains his unvaporized oil from his primary stills, of which he shows ten, into his secondary or independent cracking still, and in said last named still said unvaporized oil and the condensates resulting from the first cracking operation are mingled, and, so mingled, undergo a secondary cracking process to a limited degree. We say limited degree because Curran so indicates in his specification wherein he states, speaking of his second cracking operation that "By the process of this invention it is feasible to recover the coke from the eleventh or last still and also *save the light ends.*" (Italics ours.) He further states that his secondary or independent still saves the necessity of a separate tar still and the loss of heat and time in directing the heavier distillates into such a separate tar still.

We think the fair construction of the claims here under consideration, especially when read in the light of appellant's specification, is that only the condensates resulting from his first cracking operation enter his independent cracking zone. Unlike Curran, who drains his unvaporized oil into his second cracking still, appellant drains his unvaporized oil directly from his primary still.

In view of these facts, we do not think that it would be obvious to one skilled in the art to apply a higher pressure in the secondary still of Curran and also cut off his drainage pipes from his ten primary stills to his independent cracking still. While, as before stated, the prior art shown by the references taught that higher pressure was desirable for cracking the lighter components of oil, it does not follow that such higher pressure would be desirable for cracking condensates resulting from a previous cracking operation, mingled with a substantial quantity of unvaporized oil.

Certainly there is nothing in Curran's disclosure to show that he ever contemplated a use of his apparatus producing such a result as appellant secures by his process, and, as said before, we think the modifications of Curran's apparatus necessary to effect the process disclosed by appellant would be so great and substantial that they would not be obvious to one skilled in the art. For the reasons stated, we think that claims 26, 27, and 30 should be allowed.

With regard to the second group of claims, represented by claim 32, it is sufficient to observe that all of them include elements of the first group of claims hereinbefore discussed, which we hold constitutes invention, and in addition call for continuously advancing a stream of charging oil through the initial cracking zone.

In view of our holding that claims 26, 27, and 30 should be allowed, we think claims 32, 33, 34, 36, and 37 are also allowable. In other words, none of the references relied upon constitutes an anticipation of these claims for the reason that the modifications necessary in the apparatus or methods shown and described in such references to perform the process disclosed by appellant are so great and substantial that they would not be obvious to one skilled in the art.

Appellant in his brief, and upon oral argument, stated that his appeal with respect to claims 28, 31, and 35 was dismissed. Treating this as a motion to dismiss, the appeal is dismissed as to said claims.

For the reasons stated, claims 26, 27, 30, 32, 33, 34, 36, and 37 are held to be allowable, and the decision of the Board of Appeals is reversed as to said claims.

Reversed.